*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-AA-386

NELSON BOSTIC, PETITIONER,

FILED 06/29/2017
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

V.

DISTRICT OF COLUMBIA HOUSING AUTHORITY, RESPONDENT.

On Petition for Review of an Order of the
District of Columbia Housing Authority
(C-393-14)

(Argued November 21, 2016            Decided June 29, 2017)

*Beth Mellen Harrison*, Legal Aid Society of the District of Columbia, with whom *Jonathan H. Levy*, Legal Aid Society of the District of Columbia, was on the brief, for petitioner.

*Frederick A. Douglas*, with whom *Curtis A. Boykin* and *Alex M. Chintella* were on the brief, for respondent.

*Chad A. Readler*, Acting Assistant Attorney General, *Channing D. Phillips*, United States Attorney, and *Mark B. Stern* and *Sarah Carroll*, Attorneys, Appellate Staff, Civil Division, U.S. Department of Justice, were on the brief for the United States as amicus curiae in support of respondent.

Before FISHER and MCLEESE, *Associate Judges*, and BELSON, *Senior Judge*.

MCLEESE, *Associate Judge*: Petitioner Nelson Bostic seeks review of a decision of the District of Columbia Housing Authority (DCHA) to terminate him from a housing-voucher program because Mr. Bostic is required to register for life

as a convicted sex offender. Mr. Bostic contends that DCHA's decision is contrary to federal law. We affirm.

## I.

The Section 8 Housing Choice Voucher Program is a rent-subsidy program funded by the United States Department of Housing and Urban Development (HUD) and administered in the District by DCHA. 42 U.S.C. § 1437f(a), (o)(1) (2015); 24 C.F.R. § 982.1(a)(1) (2016); D.C. Code § 6-202 (2016). Participants in the program can rent existing units on the private market, paying a percentage of their income towards rent, with the remaining cost paid by government subsidy. 42 U.S.C. § 1437f(o).

The federal Housing Act, the Quality Housing and Work Responsibility Act (QHWRA), and related HUD regulations establish requirements for the program, including policies on admission to and termination from the program. 42 U.S.C. § 1437f(o); 42 U.S.C. §§ 13661-64 (2015); 24 C.F.R. pt. 982 (2016). Specifically, QHWRA requires that "[n]otwithstanding any other provision of law, an owner of federally assisted housing shall prohibit admission to such housing for any household that includes any individual who is subject to a lifetime registration

requirement under a State sex offender registration program." 42 U.S.C. § 13663(a). A HUD regulation promulgated in 2001 requires local public-housing agencies (PHAs) such as DCHA to prohibit admission to the program of households that include a member subject to lifetime sex-offender registration. 24 C.F.R. § 982.553(a)(2)(i) (2016). In 2013, DCHA promulgated 14 DCMR § 5804.1 (b), mandating termination from the program of any family if "[a]ny member of the household is subject to a lifetime registration requirement under a state or District of Columbia sex offender program."

We understand the following circumstances to be undisputed for purposes of this appeal. In 1982, Mr. Bostic was convicted of forcible rape in the District of Columbia. He served eighteen years in prison and was released on parole in 2000. Under the District's Sex Offender Registration Act, Mr. Bostic is required to register for life as a convicted sex offender. D.C. Code § 22-4001 et seq. (2012). Mr. Bostic registered in 2000, and he has subsequently verified his registration information with the Metropolitan Police Department as required. He has complied with all of the conditions of his parole and has not been arrested since his release.

Shortly after his release, Mr. Bostic applied to DCHA for housing assistance under the program and was placed on a waiting list. In 2008, Mr. Bostic reached the top of the waiting list. As part of DCHA's screening of applicants, Mr. Bostic provided a police clearance from the Metropolitan Police Department. Because his conviction was over twenty-five years old, it did not appear on the clearance, which looked back only six years. DCHA did not ask Mr. Bostic any other questions about his criminal history. Mr. Bostic was admitted to the program and moved into an apartment. Because 24 C.F.R. § 982.553(a)(2)(i) precludes admission of lifetime sex-offender registrants, Mr. Bostic was admitted to the program in violation of federal law. In 2014, DCHA conducted an internal audit and discovered Mr. Bostic's status as a lifetime sex-offender registrant. Relying on 14 DCMR § 5804.1 (b), DCHA recommended that Mr. Bostic be terminated from the program.

At an informal hearing before DCHA, Mr. Bostic did not dispute his status as a lifetime sex-offender registrant. Instead, he presented evidence that he requires assistance from a home health-aide five days a week and could not secure housing without a subsidy because of his debilitating health problems. In addition, Mr. Bostic argued that 14 DCMR § 5804.1 (b) was contrary to federal law. Concluding that 14 DCMR § 5804.1 (b) was mandatory and not contrary to federal

law, the Hearing Examiner directed that Mr. Bostic be terminated from the program. DCHA's Executive Director affirmed the hearing examiner's decision.

## II.

Mr. Bostic renews his argument that 14 DCMR § 5804.1 (b) is contrary to federal law. We conclude otherwise.

Under the Supremacy Clause of the United States Constitution, federal law preempts local law that "interfere[s] with, or [is] contrary to" federal law. *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (internal quotation marks omitted); *see also* U.S. Const. art. VI., cl. 2; *Murray v. Motorola, Inc.*, 982 A.2d 764, 771 (D.C. 2009). Federal law can expressly or implicitly preempt local law. *Hillsborough Cty.*, 471 U.S. at 713. Implied preemption falls into two "not rigidly distinct" categories, "conflict preemption" and "field preemption." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (internal quotation marks omitted). Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Murray*, 982 A.2d at

771 (internal quotation marks, ellipses, and brackets omitted). Field preemption "occurs when federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* at 771-72 (internal quotation marks omitted).

For purposes of preemption analysis, federal and local law includes federal and local regulations. *Murray*, 982 A.2d at 771-72; *Hillsborough Cty.*, 471 U.S. at 713. Thus, a statute enacted by the Council of the District of Columbia can be preempted by either a congressional statute or a federal-agency regulation. *Goudreau v. Standard Fed. Savings & Loan Ass'n*, 511 A.2d 386, 389-90 (D.C. 1986). It follows that a regulation promulgated by an agency of the District of Columbia can also be so preempted.

Mr. Bostic does not identify a federal statute or regulation that explicitly precludes DCHA from terminating Mr. Bostic from the program. Rather, Mr. Bostic argues that various statutory provisions and regulations, taken together, demonstrate that Congress and HUD intended to preclude PHAs from terminating lifetime sex-offender registrants such as Mr. Bostic. Specifically, Mr. Bostic argues that (1) the provisions governing the authority of PHAs to administer the program do not give PHAs general authority to terminate participants from the

program, *see* 24 C.F.R. § 982.54 (2017); (2) the HUD regulations specifically addressing termination from the program are exclusive and do not include status as a lifetime sex-offender registrant, *see* 24 C.F.R. §§ 982.552, .553 (2016); (3) although QHWRA and its implementing regulations bar lifetime sex-offender registrants from *admission* to the program, QHWRA does not provide for *termination* of such registrants from the program, *see* 42 U.S.C. § 13663; (4) in contrast, QHWRA explicitly provides for termination from the program of certain illegal drug users and alcohol abusers, *see* 42 U.S.C. § 13662(a); and (5) HUD's prior statements and guidance supported the conclusion that PHAs may not terminate lifetime sex-offender registrants from the program, and to the extent that HUD takes the contrary position in its amicus brief in this case, HUD's later position is not entitled to deference.

Mr. Bostic presents a quite substantial argument. Nevertheless, we are ultimately unpersuaded. As previously noted, federal law requires PHAs to prohibit admission to the program of households that include a lifetime sex-offender registrant. 24 C.F.R. § 982.553(a)(2)(i). Mr. Bostic was erroneously admitted to the program despite this prohibition. It would be quite surprising if federal law prohibited DCHA from ever correcting that erroneous admission. We conclude that federal law does not so tie DCHA's hands.

In arguing that federal law does preclude DCHA from ever correcting its error in admitting him to the program, Mr. Bostic contends that Congress and HUD could reasonably have concluded that the disruptive effects of withdrawing housing benefits that have already been granted, even in error, outweigh the interest in denying housing benefits to lifetime sex-offender registrants. This contention, however, is contradicted by a variety of provisions that either authorize or require PHAs or private property-owners to deny benefits under the program to lifetime sex-offender registrants already admitted to the program. Most significantly, federal law prohibits owners of federally assisted housing from admitting lifetime sex-offender registrants to such housing. 42 U.S.C. § 13663(a). The scope of this provision is not entirely clear, but Mr. Bostic does not appear to dispute that at a minimum the provision would preclude any new property owner from providing Mr. Bostic with housing under the program. HUD argues more broadly that the provision would have required the owner of Mr. Bostic's apartment to evict Mr. Bostic immediately upon learning that Mr. Bostic was a lifetime sex-offender registrant. We need not decide that question, or the related question whether the provision would preclude a property owner under the program from renewing the lease of a known lifetime sex-offender registrant. Rather, it suffices for current purposes to conclude that this provision undermines

Mr. Bostic's contention that federal law is intended to protect those admitted to the program in error from having benefits under the program subsequently denied on the basis of their status as lifetime sex-offender registrants. Moreover, it would be absurd to require DCHA to maintain Mr. Bostic in the program if no property owner could permissibly admit him to housing under the program.

A number of other provisions also undermine Mr. Bostic's contention that federal law should be understood to protect his interest in remaining in the program even though he was admitted to the program in violation of federal law. First, QHWRA authorizes PHAs to obtain information about the sex-offender status of "tenants" for purposes of "lease enforcement[] and eviction." 42 U.S.C. § 13663(c). That provision clearly signals Congress's understanding that status as a lifetime sex-offender registrant can be a basis not only for denial of admission to the program but also for eviction. Second, in some circumstances a PHA also serves as the property owner under the program. In that situation, a federal regulation authorizes the PHA to evict a tenant who is a lifetime sex-offender registrant. 24 C.F.R. § 966.4(l)(2)(iii)(B) (2017) ("The PHA may terminate the tenancy only for . . . [o]ther good cause[, which] includes, but is not limited to . . . [d]iscovery after admission of facts that made the tenant ineligible."); *cf. Zimbelman v. Southern Nev. Reg'l Hous. Auth.*, 111 F. Supp. 3d 1148, 1151-55 (D.

Nev. 2015) (upholding PHA's termination of lease of tenant living in property leased by PHA, where tenant had been admitted to program but was later determined to be registered sex-offender). Here too HUD argues that PHAs are not merely authorized but instead required to evict in such circumstances. We need not decide whether such eviction is merely authorized or instead required, because either way federal law does not protect the interests of lifetime sex-offender registrants who are erroneously admitted to the program. Third, private property owners also apparently retain the authority to evict tenants on the ground that they are lifetime sex-offender registrants. 24 C.F.R. §§ 5.851(b) (2017) (noting that property owners "retain authority to terminate tenancy on any basis that is otherwise authorized"), 982.310(a) (property owner may terminate tenancy during term of lease based on "[v]iolation of federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the premises; or . . . [o]ther good cause").

In sum, we conclude that federal law on balance undermines rather than supports Mr. Bostic's claim that he is entitled as a matter of federal law to remain in the program even though he was admitted to the program in violation of federal law. *See generally Zimbelman*, 111 F. Supp. 3d at 1155 (" . . . Congress intended to prohibit lifetime sex offender registrants from being in this public housing

program -- indeed, Congress passed 42 U.S.C. § 13663 to prohibit sex offender registrants in housing programs. It would be absurd to conclude Congress intended to prohibit terminating a lifetime sex offender registrant who mistakenly made it into the system."). We therefore hold that DCHA permissibly terminated Mr. Bostic from the program.

In light of our holding that federal law permits DCHA, relying on 14 DCMR § 5804.1 (b), to terminate Mr. Bostic from the program, we need not and do not decide whether federal law itself requires that DCHA do so. We note, however, that the cases on which Mr. Bostic principally relies address the latter question -- whether federal law itself provides a basis for terminating lifetime sex-offender registrants from the program -- rather than the question we decide today -- whether federal law precludes a PHA from terminating such registrants from the program based on provisions of local law. *Miller v. McCormick*, 605 F. Supp. 2d 296, 304-13 (D. Me. 2009); *Perkins-Bey v. Hous. Auth.*, No. 4:11CV310JCH, 2011 WL 939292, *2-4 (E.D. Mo. Mar. 14, 2011); *Hous. Auth. v. Ali Kenyatta Bros.*, 2013 WL 3766903, at *4-8 (Conn. Super. Ct. June 21, 2013); *Bonseiro v. New York City Dep't Hous. Pres. & Dev.*, No. 14793/11, 2012 WL 517198, *2-5 (N.Y. Sup. Ct. Feb. 15, 2012).

## III.

Mr. Bostic also argues that it would be impermissibly retroactive to apply 14 DCMR § 5804.1 (b) to him, because that regulation was promulgated years after Mr. Bostic was admitted to the program. Mr. Bostic, however, did not properly raise this claim before DCHA.

Before the Hearing Officer, Mr. Bostic argued primarily that 14 DCMR § 5804.1 was precluded by federal law. Although Mr. Bostic did argue that terminating him from the program would be unfair under the circumstances, he did not argue that the regulation could not lawfully be applied to him because it was impermissibly retroactive. The Hearing Officer therefore understandably did not address that issue. In his appeal to the Executive Director, Mr. Bostic once again did not raise any retroactivity claim. The Executive Director therefore did not address the issue.

Mr. Bostic did raise a retroactivity claim in a letter requesting reconsideration of the Executive Director's final decision. As Mr. Bostic acknowledges, however, the DCHA regulations governing the informal-hearing process do not provide for motions to reconsider the Executive Director's decision.

14 DCMR § 8905 (2017). That may explain why, as far as the record reveals, the Executive Director never responded to Mr. Bostic's letter. In any event, even in the context of formal motions for reconsideration, claims raised for the first time on reconsideration are generally treated as forfeited. *See, e.g.*, *Jemison v. National Baptist Convention, USA, Inc.*, 720 A.2d 275, 282 (D.C. 1998) ("[W]e conclude that [appellant] waived [his argument] in this case by failing to raise it at any time before filing the motion for reconsideration."); *BNSF Ry. v. Surface Transp. Bd.*, 372 U.S. App. D.C. 1, 7, 453 F.3d 473, 479 (2006) (claim presented for first time in motion to reconsider before Board "came too late to command the attention of the Board, let alone that of this court").

"In the absence of exceptional circumstances, a reviewing court will refuse to consider contentions not presented before the administrative agency at the appropriate time." *Goodman v. District of Columbia Rental Hous. Comm'n*, 573 A.2d 1293, 1301 (D.C. 1990). We see no exceptional circumstances in this case. Accordingly, we decline to address Mr. Bostic's retroactivity argument on the merits. We do note, however, our doubt that application of DCHA's termination regulation to Mr. Bostic impermissibly interfered with any legitimate interest of Mr. Bostic, given that Mr. Bostic was originally admitted to the program in violation of federal law.

**IV.**

For the foregoing reasons, the order of the DCHA is

*Affirmed.*